Anthony S. RUSSO, Administrator of the Estate of Elizabeth Russo, Deceased

v.

Irwin L. PEIKES, M.D.

Anthony S. RUSSO, Administrator of the Estate of Eric Russo, Deceased

v.

Irwin L. PEIKES, M.D.

Civ. A. Nos. 72–1246, 72–1260.

United States District Court, E. D. Pennsylvania.

April 9, 1976.

Arnold M. Kessler, Philadelphia, Pa., for plaintiff.

J. Grant McCabe, III, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

These medical malpractice actions resulted in a verdict for defendant after a consolidated jury trial lasting nine days. Presently before the Court is plaintiff's motion for a new trial. For the reasons stated below, the motion will be denied. Our decision rests heavily upon the particular facts of this case and, therefore, some detail is necessary in their exposition.

At the time of her death at the age of 33, Elizabeth Russo was plaintiff's wife and was pregnant with their sixth child. Defendant was Elizabeth Russo's obstetrician during this pregnancy. Two days prior to her scheduled Caesarean childbirth, Elizabeth Russo suddenly collapsed and died. The child she was carrying was shortly thereafter delivered by Caesarean section. The infant, named Eric, survived for three days. At trial, it was stipulated between counsel that Eric's death was causally related to the death of his mother. [N.T. 2–18 to 2–20.]

Plaintiff's theory of the case was that Elizabeth Russo's death was caused by congestive heart failure. Plaintiff alleged, and attempted to prove at trial, that progressive symptoms of that disease began to appear in the sixth month of pregnancy,[1]

---

1. Briefly stated, the symptoms suggested by plaintiff's evidence, of which defendant was allegedly aware, were:

1. Edema, particularly involving severe swelling of the ankles and feet;
2. Shortness of breath;

that defendant should have recognized the existence of a problem and that defendant breached his duty of care as an obstetrician by his failure to consult with, and have his patient examined by, an expert in the field of cardiology who could have made a positive diagnosis and treated the patient. The main thrust of the defense was that congestive heart failure was not the cause of Elizabeth Russo's death. Both sides offered extensive expert testimony in support of their respective positions.

Before beginning a discussion of the specific issues presented by this motion, several relevant points in the chronology of these lawsuits should be noted. The suits were filed at the end of June, 1972. The consolidated trial began on April 28, 1975. One week prior to the commencement of the trial, Arnold M. Kessler, Esquire, entered his appearance as co-counsel for the plaintiff and he served as plaintiff's trial counsel.

■ Plaintiff's first contention is that the Court erred in refusing to permit Dr. Marvin Aronson, a pathologist, to testify as a rebuttal witness. Plaintiff sought to have Dr. Aronson testify concerning what he, as an expert pathologist, observed on the tissue slides which were prepared following the autopsy performed on Elizabeth Russo. The autopsy was performed by Dr. Hitoshi Tamaki, a pathologist based at Montgomery Hospital in Norristown, Pennsylvania, on the day following Elizabeth Russo's death. In order to understand the significance of Dr. Aronson's proposed testimony, a brief explanation is necessary of how the expert medical evidence developed at trial.

Plaintiff first called Dr. Tamaki, as a fact witness only, to testify concerning the findings contained in his autopsy report. Dr. Tamaki's direct and cross-examination established that among the microscopic findings which he listed in the autopsy report, based on his examination of the tissue slides, were the presence of focal interstitial myocardial fibrosis, which he described as "a few scattered areas of minimal fibrosis," and "quite a few" cells in the lung sacs which "have the general appearance of heart failure cells." [2] [N.T. 2–124, 2–137, 2–141.] Plaintiff purposefully did not seek to elicit Dr. Tamaki's opinion on any of his autopsy findings. Rather, employing a hypothetical question which included both the symptoms outlined in footnote 1 and the factual autopsy findings testified to by Dr. Tamaki, plaintiff offered the opinions of an expert cardiologist and an expert in obstetrics and gynecology that the cause of Elizabeth Russo's death was congestive heart failure. [N.T. 3–114 to 3–115, 4–11.] Neither of these two experts made an independent examination of the tissue slides which formed the basis for the microscopic findings contained in the autopsy report. [N.T. 3–135, 4–34 to 4–35.]

Defendant called an expert cardiologist, Dr. Bernard L. Segal, who testified that the evidence did not support a conclusion that heart disease was responsible for the death of Elizabeth Russo. [N.T. 6–57.] An ex-

3. Constant fatigue;

4. Cough;

5. Orthopnea, or an inability to breathe except in an upright position, which resulted in difficulty in sleeping; and

6. Periods of simultaneous perspiration and coldness of the hands and feet.

2. The actual entries in the autopsy report were:
   "1. Heart – – Focal interstitial myocardial fibrosis
   2. Lungs – – Acute congestion
   Many 'heart failure' cells"
   [Exhibit D–3, at 3.]

On cross-examination, Dr. Tamaki elaborated on the meaning of these entries without expressing any opinion as to their significance. He explained that true heart failure cells are "large cells found within the lung sacs when a patient dies of heart failure" which contain "hemosiderin pigments within the cells." [N.T. 2–141, 2–143.] He went on to state that "the term is sometimes used rather broadly and many cells that are not true heart failure cells, resemble heart failure cells, may be called as such." [N.T. 2–141.] This was his explanation for why the term "heart failure" was enclosed within quotation marks in his autopsy report entry.

pert in obstetrics and gynecology, called by defendant, offered the opinion that defendant did not deviate from the proper standard of care in this case.

Three pathologists were also called as defense witnesses. First, Dr. Tamaki was recalled as an expert witness for the defense. He stated his opinion that there was no evidence of chronic congestive heart disease revealed by his autopsy [N.T. 5–131], that "for the most part" true heart failure cells were not present in the lungs [N.T. 5–138], and that the focal interstitial myocardial fibrosis shown on the tissue slides was "very, very minimal" and "not a significant finding" [N.T. 5–139]. Dr. Halbert Fillinger testified for the defense that the tissue slides contained no evidence of "functional heart disease." He stated that the "small areas of fibrosis" present in the heart tissue were "very insignificant" [N.T. 5–170], and that heart failure cells were "not present in the magnitude that I would expect to see in a person with chronic heart failure" [N.T. 5–172]. Finally, defendant presented the videotaped deposition of Dr. A. Reynolds Crane, which was taken on April 21, 1975. Dr. Crane stated that there was no evidence that Elizabeth Russo had congestive heart failure, that he found no true heart failure cells present on the tissue slides nor any sign of focal interstitial myocardial fibrosis. [Transcript of Exhibit D–5, at 16, 18, 24–25.] Each of the patholo-

gists stated that their opinion was based upon their own examination of the tissue slides.

At the conclusion of defendant's case, plaintiff attempted to call Dr. Aronson in rebuttal. According to plaintiff's offer of proof, Dr. Aronson would testify that his examination revealed ample signs of congestive heart failure on the tissue slides, the presence of true heart failure cells in the lung sacs and clear evidence of a damaged heart in the existence of the fibrosis. After extensive discussion between counsel and the Court on the precise nature and purpose of the proposed testimony and the competing interests called into play by the offer, the Court sustained defendant's objection and refused to permit Dr. Aronson to testify. [N.T. 8–24 to 8–29, 8–58 to 8–87.] Further reflection has not altered our view that this decision was a proper exercise of the Court's discretion.

We do not quarrel with plaintiff's characterization of Dr. Aronson's testimony as noncumulative and important to his position.[3] However, in this case, the normal rule would only permit rebuttal testimony as to *subordinate* evidential facts offered by defendant or facts offered by defendant which discredited plaintiff's witnesses on any issue. 6 *Wigmore, Evidence,* § 1873, at 510, 511 (3d ed. 1940) [hereinafter cited as *Wigmore*]. Under the circumstances

---

**3.** Dr. Aronson's proposed testimony must really be classified into two distinct categories. First, he was to state his "factual" findings, *i.e.,* what he, as a pathologist, observed on the tissue slides. This testimony would concededly have been important and non-repetitive, as none of the witnesses during plaintiff's case in chief stated definitively that true heart failure cells and significant fibrosis were evident on the slides. The effect of the testimony would have been to supplant and effectively discredit Dr. Tamaki's autopsy findings, which were offered in plaintiff's own case and which plaintiff apparently considered sufficient to use as one of the foundations for his hypothetical questions, with a new statement of postmortem findings more clearly supportive of the theory that Elizabeth Russo died of congestive heart failure. We continue to harbor the concern

expressed at trial [N.T. 8–66 to 8–68] that this is not a proper purpose for rebuttal evidence. However, we do not base our refusal to allow the testimony on that ground, but rather on the reasons expressed in the body of this Memorandum.

The second element of Dr. Aronson's proposed testimony was his opinion as to the cause of death. The Court believes that this evidence would have been cumulative and was properly excluded for that reason, as well as the other considerations stated in the body of this Memorandum. While plaintiff's other experts were not pathologists and had not personally examined the tissue slides, the Court believes that they afforded the jury a very clear understanding of plaintiff's position concerning the cause of Elizabeth Russo's death.

presented here, we do not believe that the substance of Dr. Aronson's proposed testimony can be classified as a matter properly not evidential until the rebuttal, so that plaintiff would have the right to put it in at that time. *Wigmore,* § 1873, at 517. Whether the testimony is viewed as an offer of new facts which ought to have been put in during the case in chief, or a repetition by a new witness of former facts already once evidenced, the customary rule equally forbids it. *Wigmore,* § 1873, at 516.

We believe that several factors weigh in favor of our decision. First, the tissue slides which formed the basis for Dr. Aronson's proposed testimony have been in existence since shortly after the death of Elizabeth Russo. [N.T. 2–150.] They have been available for inspection by plaintiff's experts since the time of the filing of the complaints, almost three years prior to the trial. The Court was not presented with an offer of new factual evidence discovered during the trial, but rather with a new interpretation of physical evidence which had always existed during the pendency of these lawsuits.

█ Second, the fact that the autopsy findings were in issue was clearly known to plaintiff when he presented his case in chief. Even if a pathologist's testimony explaining the significance of what appears on the tissue slides was not a necessary element of plaintiff's prima facie case, it would have been evidence corroborative of plaintiff's theory and both relevant and properly presented as a part of the case in chief. Plaintiff's ability to anticipate the defense is apparent both from his counsel's intentional [N.T. 2–114] and persistent efforts to prevent Dr. Tamaki from expressing any opinions while testifying in plain-

tiff's case and from the fact that Dr. Crane's videotaped testimony, taken in advance for use at trial, clearly stated a view of what the tissue slides revealed which was at odds with plaintiff's position. In light of this knowledge, the Court believes that the testimony of a pathologist, if it were to be offered by plaintiff at all, should have been presented in the case in chief. *See Skogen v. Dow Chemical Company,* 375 F.2d 692, 705–706 (8th Cir. 1967).[4]

Finally, the question of unfair surprise to defendant is a factor. As defense counsel stated at the time the offer was made:

> The entire defense of this case was predicated on the discovery that was conducted in this case and the pretrial representations that were being made and there were only as far as the defendant knew three pathologists who had ever looked at those slides, Dr. Tamaki, Dr. Crane, and Dr. Fillinger. If there had been other pathologists who had looked at them—and others could have looked at them—we would have dealt with whatever the situation then presented in developing the defense of the case. [N.T. 8–72; *see* 2–135.]

As we have suggested, this was a point upon which substantial contest could be anticipated. The failure to present the testimony of a pathologist earlier in the case was not an inadvertent omission. Accordingly, defendant was justified in assuming that plaintiff's case in chief was the entire case which he had to meet. To have allowed Dr. Aronson's testimony in rebuttal would have given plaintiff an unfair "tactical advantage by a dramatic final statement on the issue." *Skogen v. Dow Chemical Company, supra* at 706; *Wigmore,* § 1873, at 511, 516.

---

**4.** The Court recognizes that a plaintiff does not have to offer evidence in its case in chief to negate every potential defense theory. *Weiss v. Chrysler Motors Corp.,* 515 F.2d 449, 459 (2d Cir. 1975). However, in addition to making out its prima facie case, we believe that a plaintiff may reasonably be required to offer, in its initial presentation, its evidence on any other issue which is expected to be important to the outcome of the case and on which it is known that defendant intends to produce evidence.

Examination of *Weiss* is particularly instructive, as we would consider it persuasive precedent for granting a new trial in this case if it were not for one crucial distinction. In *Weiss,* the defense theory at which the proposed rebuttal evidence was aimed was not known to the plaintiff until the presentation of the defendant's case. *Id.* at 459. As noted above, this is not true in the instant case.

While plaintiff's able and experienced trial counsel entered the case only shortly before trial, the Court does not believe that that fact excuses the untimely offer of Dr. Aronson's testimony. As early as November 20, 1973, plaintiff listed "a pathologist—to be named" as a potential witness in his case. Plaintiff's Pre-Trial Memorandum, at 3. Yet the Court is aware of no effort made by plaintiff to obtain the opinion testimony of a pathologist until the afternoon of the sixth day of trial, well into defendant's case, when plaintiff's counsel borrowed the tissue slides overnight and took them to Dr. Aronson to examine. It took Dr. Aronson only 45 minutes to view the slides and agree to testify. [N.T. 8–75 to 8–76.] The Court believes that such arrangements could have been made well in advance of trial. In light of plaintiff's clear knowledge that the meaning of the autopsy results was a very important issue in the case, the rebuttal testimony would have unfairly disadvantaged defendant and was properly excluded.

■ Plaintiff next contends that it was error to permit the testimony of Peter M. Clark, an associate in the law firm representing defendant. During his cross-examination of Dr. Segal, the cardiologist who testified for defendant, plaintiff's counsel attempted to impeach the witness' credibility by establishing that, in a letter written prior to trial,[5] Dr. Segal had encouraged defense counsel to "shop around" for a pathologist who would support his position that there was no postmortem evidence that heart disease was the cause of Elizabeth Russo's death. Defendant offered Mr. Clark's testimony in an effort to rehabilitate Dr. Segal as a credible witness. Clark testified that, at the meeting in Dr. Segal's office during which the May 8, 1974 letter was dictated, the cardiologist suggested that defense counsel obtain the opinion of "a pathologist with the highest qualifica-

tions available to see if we could confirm the findings of Dr. Fillinger with regard to the slides." [N.T. 7–83.] In other words, Dr. Segal suggested that defense counsel confirm one of the facts upon which he was basing his own expert opinion that heart disease was not the cause of death—namely, that the tissue slides contained no evidence of heart disease. The Court specifically permitted Clark's testimony not for the truth of what Dr. Segal may have stated, but for whether it was said or not. [N.T. 7–83.] The Court believes the testimony was properly admitted. As stated in *Lyke v. Lehigh Valley Railroad Co.*, 236 Pa. 38, 48, 84 A. 595, 598 (1912):

> Testimony of this character is known as evidence of a consonant statement; and this may be defined as a prior declaration of a witness whose testimony has been attacked and whose credibility stands impeached, which, considering the impeachment, the court will allow to be proved by the person to whom the declaration was made, in order to support the credibility of the witness, and which, but for the existence of such impeachment, would ordinarily be excluded as hearsay.

The Court also believes that Clark's testimony as to why Dr. Tamaki was not contacted prior to trial by defendant's counsel or experts concerning his autopsy findings was relevant to the issues raised by plaintiff's cross-examination of Dr. Segal and, thus, was properly permitted. *See Cafasso v. Pennsylvania R. Co.*, 169 F.2d 451, 453 (3d Cir. 1948); *Commonwealth v. Wilson*, 431 Pa. 21, 33–34, 244 A.2d 734, 741 (1968).

While we have addressed only the contentions which were briefed and argued, we have considered all of the grounds alleged by plaintiff in his motion and have determined that there is no basis for awarding a new trial.

An appropriate Order will be entered.

---

5. Dr. Segal's letter to Mr. Clark, dated May 8, 1974, stated:

    May I suggest that another expert witness be involved directly substantiating the fact that the postmortem findings including the histology microscopic slides show no evi-

dence for heart disease? In other words, I am suggesting that an expert pathologist be invited to participate in favor of this stand. Dr. H. Fillinger is an expert witness but it will be helpful if another pathologist were to substantiate his findings. [N.T. 6–98.]