John H. SMITH, Plaintiff-Appellee,

v.

FORD MOTOR COMPANY, Defendant-Appellant.

No. 78–1636.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 24, 1980.

Decided July 17, 1980.

Rehearing Denied Sept. 16, 1980.

Edward P. Moriarity of Spence, Moriarity & Schuster, Jackson, Wyo. (G. L. Spence and Robert P. Schuster of Spence, Moriarity & Schuster, Jackson, Wyo., and John R. Hursh, Central Wyoming Law Associates, Riverton, Wyo., with him on the brief), for plaintiff-appellee.

Gordon G. Greiner of Holland & Hart, Denver, Colo. (G. G. Greenlee of Murane & Bostwick, Casper, Wyo., with him on the brief), for defendant-appellant.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

BARRETT, Circuit Judge.

The basic controversy in this case has been previously before this Court, and our opinion is reported in *Fox v. Ford Motor Company*, 575 F.2d 774 (10th Cir. 1978). Both the prior case and the present one arose from an automobile collision which occurred on January 29, 1973. The plaintiff, John H. Smith, was riding as a front-seat passenger in a 1970 Ford, four-door Thunderbird. Driving the car in which the plaintiff was riding was Mr. Fox, who was a plaintiff in the prior case, and who obtained a judgment for a loss as a result of the death of his wife. Their wives were passengers in the back seat of this car and both were killed.

John H. Smith, plaintiff herein, filed this action on July 30, 1976. He alleged that he suffered personal injuries as a result of defective safety belts and seats; that the defective conditions were the result of negligence in the design, installation, construction, inspection and testing of the seat belts, the seat tracks, dashboard and windshield. There were claims which alleged strict liability and breach of warranty as well.

The January 29 headon collision resulted from a pickup truck crossing the center line into the plaintiffs' lane on the opposite side of the highway. The Smiths and the Foxes had been driving in an opposite direction and so the almost headon impact was a heavy one. Even though neither vehicle was moving at high speeds, the vehicular damage and the personal injuries were of great magnitude. The approximate speed of each vehicle was 25 to 45 miles per hour just before the impact.

The main action against Ford is based upon the alleged negligent design of the seats and the seat belts, together with the subsequent negligence in failing to correct some of these conditions after having discovered the defects. All of the passengers wore lap seat belts. The Messrs. Fox and Smith had shoulder belts available, but they were not using them. Smith's injuries were more severe than those of Fox. There is, of course, no contention that any defect in the vehicle itself caused the headon collision. The contention is that the injuries of Smith were greatly aggravated due to the defects in design of the lap belt and the manner in which it was anchored so that it could not protect passengers in a heavy impact.

Plaintiff Smith, whose case is before us, incurred very serious permanent internal injuries. Included were injuries to his spleen and pancreas, as well as to his intestines and face. The spleen had to be removed as a result of the injuries incurred, and subsequently a pancreatic condition developed. Smith's complaint was that he had suffered a great amount of pain and would suffer future consequences which allegedly included impairment of his eating ability, diarrhea, possible diabetes and future surgery from the pancreatitis. Also alleged was the risk of blindness, stroke, cancer, heart disease, impotency and amputation. From the removal of the spleen it was alleged that phlebitis, pneumonia, clotting, pulmonary infarctions and susceptibility to infection had occurred.

The cause was tried to a jury, and following a 10-day trial, a verdict in the amount of $800,000 was returned. Ford seeks review and reversal of the judgment based upon this verdict. Motions for judgment notwithstanding the verdict, for new trial, and remittitur were filed and denied. Various issues are raised on appeal. However, our determination that the District Court erred in receiving the testimony of a crucial expert witness is dispositive.

I.

Ford strenuously asserts that the District Court abused its discretion in allowing Dr. James W. Freston to testify, over objection, that Smith's internal injuries were significantly enhanced as a proximate result of the unreasonably dangerous passenger restraint system employed in the Fox vehicle. Ford contends that Smith's failure to disclose the substance of such testimony (1) violated the Court's pretrial order; (2) violated Smith's duty to provide supplemental responses to interrogatories pursuant to Rule 26(e), Fed.Rules Civ.Proc., 28 U.S.C.A.; and, (3) prejudiced Ford's ability to counter such evidence.

As noted earlier, Smith's theory of liability was tied to Ford's alleged breach of its duty to "design and construct automobiles in a reasonable and prudent manner so that failures of the parts of the automobile will not cause [enhanced personal] injuries to the occupants when a collision occurs." *Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1129–1130 (Wyo.1978). Proof of liability under such a theory requires the plaintiff to establish that the defective nature of the passenger restraint system proximately caused "damage or injury . . . over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design." *Larsen v. General Motors Corp.*, 391 F.2d 495, 503 (8th Cir. 1968); *Fox v. Ford Motor Co., supra*. Almost invariably, such proof entails the presentation of expert testimony. *See Randolph v. Collectramatic, Inc.*, 590 F.2d 844 (10th Cir. 1979).

*Pretrial Background*

During the discovery phase of the case, Ford propounded a series of interrogatories requesting, among other things, the following information:

23. For each expert witness, including physicians, which you may call at the trial of this matter, state:

(a) His name and address;

(b) A brief description of his testimony;

(c) Any opinions which he may be called upon to give;

(d) The facts upon which he will base such opinions.

[R., Vol. I, p. 13].

In response, plaintiff identified Dr. Brohm, Dr. Ferris, Dr. Gullickson, Dr. Axthelm and Professor Crawford as expert witnesses, described the opinions of each and set forth the basis for those opinions. In addition, Smith responded:

As the case develops, and detailed examination continues, further testimony may be required and the essence of same will be provided as required by the Rules of Civil Procedure.

[R., Vol. I, p. 19].

Plaintiff did indeed supplement this interrogatory with additional information about Professor Crawford, but failed at any time to mention Dr. Freston.

The first notice of plaintiff's intention to call Dr. Freston as an expert witness at trial occurred on January 24, 1978—less than two and one-half months before trial. Plaintiff's supplemental pretrial submission, filed that date, contained the following:

The Plaintiff, as of the date of the Supplemental Pretrial Submission, intends to call the following witnesses:

* * * * * *

8. Dr. Freston, University Hospital, Salt Lake City, Utah, will testify as to his medical treatment of the Plaintiff, as well as to his prognosis.

[App., Vol. I, pp. 71–72].

This identification was in response to an earlier court order that "the parties may

call additional witnesses . . . on the condition that at least five (5) days prior to the supplemental pretrial conference they furnish opposing counsel with the names and addresses of the additional witnesses, together with a brief summary of the testimony they are expected to give." [App., Vol. I, p. 61].

At the supplemental pretrial conference, held January 27, 1978, the parties were given until March 6, 1978, to designate additional witnesses expected to be called at trial. Although plaintiff earlier anticipated no need to call additional witnesses [App., Vol. I, p. 72], he subsequently designated fourteen other witnesses for use at trial. [App., Vol. I, pp. 114–116]. Among these witnesses were Drs. Volk and Gainsford of Salt Lake City, Utah, "listed in the medical records of the plaintiff [who] may be called to testify as to the role they played in the care and treatment of the plaintiff." [App., Vol. I, p. 114]. Ford also designated three additional witnesses. Both parties' motions to strike the testimony of certain of the recently named individuals on the grounds of inadequate time to conduct discovery prior to trial were denied by the Court on March 15, 1978. [App., Vol. I, p. 136]. Ford did not move to strike the testimony of Drs. Volk and Gainsford.

Ford earlier deposed several other doctors designated by Smith as experts likely to be called at trial—including Drs. Brohm and Gullickson. Both of these physicians were designated in plaintiff's supplemental pretrial submission as experts who would testify about medical care given to the plaintiff, as well as his prognosis. Each of these witnesses was specifically asked in deposition whether he had any opinion regarding the relationship of plaintiff's injuries and the alleged deficient design or manufacture of the automobile. Each was also asked whether he had made a study of the seat belt syndrome or read any literature in the area. Each replied in the negative to these questions. [Gullickson dep., R., Vol. XVIII, pp. 21–22; Brohm dep., R., Vol. XXI, pp. 12–15]. Dr. Freston was not deposed.

## Trial Background

On March 29, 1978, plaintiff called his first witness, Dr. James W. Freston. Freston testified that he was currently employed as a Professor of Medicine and Clinical Pharmacology, and as Chairman of the Department of Gastroenterology at the University of Utah. Dr. Freston holds both an M.D. and Ph.D. in medicine, and has compiled a list of impressive credentials, including the authorship of some sixty-two articles in his field. At one point in his testimony, he described himself as a "specialist's specialist" in the area of gastroenterology.

Early in his testimony, Dr. Freston reviewed, in detail, the history of plaintiff's injuries and subsequent medical treatment using various visual aids. From this, the doctor moved to specifically deal with the injuries to Smith's pancreas, which he identified as resulting from the automobile accident, [App., Vol. I, pp. 245, 260–261] as well as his prognosis. No defense objection was interposed as to Dr. Freston's opinion that the injuries complained of arose out of the collision between the two vehicles. Objections were interposed, however, when plaintiff's counsel attempted to elicit testimony establishing the existence of conditions consistent with seat belt injuries.

A hearing on the objections was held in chambers. Counsel for Ford claimed prejudicial surprise at Smith's attempt to elicit testimony establishing proximate causation between the lap belts employed and nature of the injuries—an area Ford claimed was clearly outside the scope of plaintiff's description of Dr. Freston's proposed testimony.[1] The Court ruled that the testimony sought was proper on three grounds: (1) that the custom of Wyoming practice has been to describe in extremely narrow terms the substance of proposed witnesses' testimony prior to trial; (2) that the claim of surprise was unjustified because "we have gone into this question as to the causal

---

1. The colloquy itself is enlightening and we feel sharpens the issues involved. Its length, however, requires that we frame it in the form of an appendix to this opinion.

condition with doctors always." [App., Vol. II, p. 267]; and, (3) that Ford's failure to object to Dr. Freston's testimony that the injury resulted from the accident waived its right to object as to relationship between those injuries and the lap belts employed.

The continuation of plaintiff's direct examination of Dr. Freston crystalized the connection between Smith's intra-abdominal injuries and the passenger restraint system. Dr. Freston stated that his examination of over one hundred intra-abdominal injuries which occurred during traffic accidents; some showing physical evidence of seat-belt injury, formed the basis for his opinion that bruises or injury high in the abdomen, such as to the pancreas, result from seat belts which fail to properly function. Where bruises are localized in the hip area, this evidences seat belts which are non-defective. With specific reference to Smith's injuries, Dr. Freston testified:

Q [Mr. Spence] All right. Now, when you find an injury as high as the pancreas, what does that mean to you?

A [Dr. Freston] Well, something unusual has happened; something out of the ordinary.

Q With respect to the functioning of the seat belt?

A Yes.

\* \* \* \* \* \*

Q What do you find in that regard?

A I find that if the seat belt isn't functioning properly and is over the abdomen rather than over the hips, the injuries tend to occur higher. And we start to see rupture of the spleen and we start to see injuries to the pancreas.

\* \* \* \* \* \*

Q Do you have an opinion based upon reasonable medical probability as to the causal—as to what caused the injuries [to the] spleen and to the pancreas in the case at hand?

MR. GREENLEE: [objection]

THE COURT: [overruled]

A Yes, I have an opinion.

Q (By Mr. Spence) Would you state to the jury what your opinion is?

A Yes. *My opinion is that the probability is overwhelming that the injury to the pancreas resulted from the automobile accident.*

*And specifically, the evidence is good that the seat belt was involved in that injury.*

And if I may—I'm sensitive to Mr. Greenlee's objection—we are quite capable of diagnosing events today that started five years ago. That's a matter of routine in medicine.

Q Thank you very much. Now, I want to ask you another question. There has been a contention made in this case that the injuries in this case were a result of upward pressure on [t]he organs in the accident, which upward pressure of the organs internally for those organs on other organs and caused the injury to the spleen and to the pancreas.

Do you have an opinion based upon reasonable medical certainty as to that contention?

A Yes.

Q Would you tell the jury what it is and the basis for your opinion?

MR. GREENLEE: [objection]

THE COURT: [overruled]

A Well, my opinion is that it's highly improbable . . .

[App., Vol. II, pp. 272–276]. [Emphasis supplied].

This testimony was presented in a graphic, persuasive manner. Following the statement of his opinion, Dr. Freston punctuated his point with empirical studies [2] and the use of a mannequin showing the various intra-abdominal organs.

At the completion of Dr. Freston's direct examination, counsel for Ford was granted

**2.** *Garrett and Braunstein, The Seat Belt Syndrome*, delivered before the Twenty-First Annual Session of the American Association for the Surgery of Trauma, Chicago, Illinois, September 28–30, 1961. [Hereinafter cited as *Garrett and Braunstein*]. A reprint of the study is available through the Highway Safety Research Institute at the University of Michigan, Ann Arbor, Michigan.

a ten minute recess to prepare for his cross-examination of the witness.[3] Ford did briefly cross-examine Dr. Freston concerning the seat belt syndrome.

■ After Dr. Freston was excused as a witness, Ford requested plaintiff's counsel to provide him with a copy of *Garrett and Braunstein*. Following plaintiff's refusal, the District Court ordered production. [App., Vol. II, pp. 316–321].[4]

Smith also produced evidence showing the motion and stress areas of the human body in relation to passenger restraint systems such as that employed here at the time of collision. Such testimony, however, dealt exclusively with the engineering and physics aspects of the collision forces. It did not relate those movements to medical injury.[5]

Ford's expert witness, Donald F. Hueke—a professor at the University of Michigan Medical School, and a recognized authority in the field of automotive injury—refuted in large part Dr. Freston's causation testimony, specifically addressing Dr. Freston's interpretation of the *Garrett and Braunstein* study.

### A.

### *The Interface Between Pretrial Discovery And the Presentation of Expert Testimony*

Traditionally, the presentation of expert testimony involving opinion evidence required the establishment of certain foundational facts prior to the expression of the opinion. *See*, J. Wigmore, Evidence § 672, at pp. 792–793 (3d Ed. 1940). The use of hypothetical questions provided the normal vehicle for the elicitation of such evidence. Although this Court treated the foundational requirements for opinion evidence liberal-

ly, *United States v. Sessin*, 84 F.2d 667 (10th Cir. 1936), *New York Life Ins. Co. v. Doerksen*, 75 F.2d 96 (10th Cir. 1935), other courts strictly enforced the requirements. *Harris v. Smith*, 372 F.2d 806 (8th Cir. 1967); *Kale v. Douthitt*, 274 F.2d 476 (4th Cir. 1960). In *Kale v. Douthitt, supra*, at p. 482, the Court stated:

Generally, a hypothetical question must assume all facts disclosed by the evidence material to the theory of the case as viewed from the side propounding the question. A question which assumes any material fact not supported by the evidence is inadmissible. A question which omits any material fact essential to the formation of a rational opinion is likewise incompetent. The facts upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture. 20 Am.Jur., Evidence, §§ 788, et seq.

The inherent problems in forcing the propounding party to supply such "material" facts often led to awkward results. For example, in *United States v. Sessin, supra*, at p. 669 the following issue arose:

A hypothetical question was propounded to a physician, upon the basis of which the witness was asked for his opinion as to the bodily ailments which afflicted plaintiff on January 1, 1919, as to the prognosis thereof, and as to whether one so afflicted was physically incapacitated to work. *The question took half an hour to propound; it was necessarily long because plaintiff's medical history was long.* It was objected that a few of the multitudinous statements of the hypothesis lacked meticulous accuracy. Two supposedly defective statements are pressed as

---

**3.** The recess was granted at 4:43 p. m. and trial resumed at 4:54 p. m. Dr. Freston was scheduled to leave Casper, Wyoming, at 9:15 a. m. the next morning.

**4.** Ford asserts that "[d]espite the Court order, plaintiff's counsel never produced the article." [Brief of Appellant at p. 35, n. 2]. Inasmuch as Smith has not expressly conceded this statement, we cannot consider it in deciding wheth-

er prejudicial error occurred. *See Braden v. University of Pittsburg*, 477 F.2d 1, 6 (3d Cir. 1973).

**5.** This testimony was presented primarily through Professor Richard H. Crawford, who specifically acknowledged that he was not qualified to discuss the relationship between the load forces and the injury from a medical standpoint.

grounds for reversal. One is that the question assumed that the wound had been cleaned out once a year. The proof was that there were twenty-three such operations over a period of seventeen years, and that plaintiff did not remember the date of the last operation although it was a good many years after he left the hospital. The other defect is that the hypothesis referred to an abscess in the abdomen as tubercular. That there was an abdominal abscess is not disputed; the proof showed a tuberculosis of the lung and leg bone at the time. No other cause for the abdominal abscess being shown, it is not an unfair inference that it was tubercular, occurring as it did between two foci of tubercular infection. [Emphasis supplied].

Although we there affirmed the trial court's decision admitting the opinion evidence, the practical difficulties are illustrated.

At the same time, the heavy burden placed on the examiner to articulate foundational facts under the hypothetical question rule, often resulted in a denial of pretrial discovery to the cross-examiner concerning the expert and his proposed testimony. Prior to the enactment of the 1970 amendments to the Federal Rules of Civil Procedure, 28 U.S.C.A., no provision was made in the Federal Rules with respect to the discovery of experts or the nature of their information. Judicial treatment of the issues surrounding the discovery of such information varied, with the result that most pre-1970 decisions denied discovery in its entirety or limited it to extremely narrow areas. *See, Long, Discovery and Experts Under the Federal Rules of Civil Procedure*, 38 F.R.D. 111, at p. 112 (1965); *Winner, Procedural Methods to Attain Discovery*, 28 F.R.D. 97 (1960). Some of the earlier cases treated experts as agents of the attorney under the attorney-client privilege and denied discovery on that basis. *See, e. g., Schuyler v. United Airlines, Inc.*, 10 F.R.D. 111 (M.D.Pa.1950); *Cold Metal Process Co. v. Aluminum Co.*, 7 F.R.D. 684 (D.Mass.1947). A second approach, patterned after the qualified work product

privilege developed in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), immunized discovery unless the opponent could show a substantial, particularized need for the information. *See, Carpenter-Trant Drilling Co. v. Magnolia Petroleum Corp.*, 23 F.R.D. 257 (D.Neb.1959). Other courts refused discovery simply on the basis of the expert's status. *See, e. g., American Oil Co. v. Pennsylvania Petroleum Products Co.*, 23 F.R.D. 680 (D.R.I.1959). Still other opinions developed a doctrine of "unfairness" holding discovery unavailable if the result was that one party would be taking unreasonable advantage of an opponent's diligence or financial resources in obtaining expert testimony. *See, e. g., United States v. 23.76 Acres of Land*, 32 F.R.D. 593 (D.Md.1963).

The drafters of the 1970 amendments to the Federal Rules of Civil Procedure sought to resolve this inharmonious state of affairs by providing a uniform, orderly scheme of discovery. That scheme of discovery is now embodied in Fed.Rules Civ.Proc., rule 26, 28 U.S.C.A. [hereinafter cited as rule 26]. Rule 26 liberalized discovery, adopting the doctrine of "unfairness" as its guide. Under rule 26(b)(4)(A)(i),

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and *to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.* (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this rule, concerning fees and expenses as the court may deem appropriate.

[Emphasis supplied].

The Advisory Committee on Civil Rules, which promulgated the original draft, published an accompanying text explaining the intent of the drafters and the basis for the new provisions:

*In cases of this character [involving expert testimony], a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation.* The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand. McGlothlin, Some Practical Problems in Proof of Economic, Scientific, and Technical Facts, 23 F.R.D. 467, 478 (1958). A California study of discovery and pretrial in condemnation cases notes that the only substitute for discovery of experts' valuation materials is "lengthy—and often fruitless—cross-examination during trial," and recommends pretrial exchange of such material. Calif. Law Rev. Comm'n Discovery in Eminent Domain Proceedings 707–710 (Jan.1963). *Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, then the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.*

Advisory Committee Notes, rule 26, Fed. Rules Civ.Proc., 28 U.S.C.A. [Emphasis supplied].

This liberalization in the discovery area also resulted in liberalization in other areas. The increased availability of discovery concerning expert witnesses and the facts upon which they based their opinions, prompted reexamination of the hypothetical question requirement and other traditional foundational basis that were necessary prior to the introduction of opinion evidence. Criticism surrounding these areas mounted:

The hypothetical question has been the target of a great deal of criticism as encouraging partisan bias, affording an opportunity for summing up in the middle of the case, and as complex and time consuming. Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 426–427 (1952).

Advisory Committee Notes, rule 705, Fed. Rules Evid., 28 U.S.C.A.

\* \* \* \* \* \*

[I]t is a failure in practice and an obstruction to the administration of justice. If we require that it recite all the relevant facts, it becomes intolerably wordy. If we allow, as most courts do, the interrogating counsel to select such of the material facts as he sees fit, we tempt him to shape a one-sided hypothesis. [Footnotes omitted]. C. McCormick, Evidence § 16 at p. 36 (2d ed. E. Cleary 1972).

It was in response to this criticism that Federal Rules of Evidence 703 and 705, 28 U.S.C.A. were enacted. Rule 705, eliminating the need for hypothetical questions, allows an expert witness to "testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise." Cross-examination may, however, be used to ferret out such underlying facts. Rule 703 specifies that the underlying facts or data need not be admissible in evidence if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *See also: Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541 (5th Cir. 1978). The combined effect of these new rules is to "place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination. As stated in the Advisory Committee Note to Rule 705, and highlighted by the elimination of the foundation often provided by the hypothetical question, 'advance knowledge through pretrial discovery of an expert witness's basis for his opinion is essential for effective cross-examination.'" *Graham, Discovery of Experts Under Rule 26(b)(4) of the Federal Rules of Civil Procedure: Part One, An Analytical Study*, 1976 U.Ill.L.F. 895, 897 [hereinafter cited as *Graham, Part One*].

The Advisory Committee on the proposed Federal Rules of Evidence, recognizing the need for such pretrial disclosure, considered

the provisions of rule 26, Fed.Rules Civ. Proc., 28 U.S.C.A. sufficient:

> If the objection is made that leaving it to the cross-examiner to bring out the supporting data is essentially unfair, the answer is that he is under no compulsion to bring out any facts or data except those unfavorable to the opinion. *The answer assumes that the cross-examiner has the advance knowledge which is essential for effective cross-examination. This advance knowledge has been afforded, though imperfectly, by the traditional foundation requirement. Rule 26(b)(4) of the Rules of Civil Procedure, as revised, provides for substantial discovery in this area, obviating in large measure the obstacles which have been raised in some instances to discovery of findings, underlying data, and even the identity of the experts.* Friedenthal, Discovery and Use of an Adverse Party's Expert Information, 14 Stan.L.Rev. 455 (1962). Advisory Committee Notes, rule 705, Fed. Rules Evid., 28 U.S.C.A. [Emphasis supplied].

Professor Friedenthal has also recognized the critical nature of such pretrial discovery:

> *It is fundamental that opportunity be had for full cross-examination, and this cannot be done properly in many cases without resort to pretrial discovery, particularly when expert witnesses are involved. Unlike two eye-witnesses who disagree, two experts who disagree are not necessarily basing their testimony on their views of the same objective features. Instead they may rely on entirely separate data, since the theoretical bases underlying their respective approaches may differ radically. Before an attorney can even hope to deal on cross-examination with an unfavorable expert opinion he must have some idea of the bases of that opinion and the data relied upon. If the attorney is required to await examination at trial to get this information, he often will have too little time to recognize and expose vulnerable spots in the testimony. He may need advice of his own experts to do so and indeed, in certain cases, his* experts might require time to make further inspections and analyses of their own.
>
> The need for pretrial discovery regarding expert witnesses is further evidenced by the ever-increasing dissatisfaction with the honesty and reliability of expert testimony. . . .

*Friedenthal, Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 485 (1962) [Footnote omitted]. [Emphasis supplied].

This liberalization is further illustrated by the provisions of rule 26(e), Fed.Rules Civ.Proc., 28 U.S.C.A. Under rule 26(e) a party is under a duty to seasonably supplement his response only in three situations, one of which includes information concerning "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony."

■ The failure of a party to comply with discovery requests under rule 26 has led to findings of prejudice resulting in the exclusion of the proffered evidence. *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3d Cir. 1977), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); *Tabatchnick v. G. D. Searle & Co.*, 67 F.R.D. 49 (D.N.J.1975). Similarly, although district courts enjoy wide discretion in handling discovery and pretrial matters, *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342 (8th Cir. 1979), reversible error has been found in allowing testimony without such discovery where there has been a "gross abuse of discretion resulting in fundamental unfairness in the trial of the case." *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir. 1977); *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978); *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449 (2d Cir. 1975).

### B.

#### The Pretrial Order

■ We have previously observed that Smith failed to provide any information, in the form of interrogatory responses, about

Dr. Freston or his proposed testimony as required by rule 26(e), Fed.Rules Civ.Proc., 28 U.S.C.A. This duty to provide responses concerning expert witnesses continues through trial. *Weiss v. Chrysler Motors Corporation, supra.* If we were faced solely with the plaintiff's failure to provide such information, we would be compelled to reverse the District Court's admission of such evidence. *Weiss v. Chrysler Motors Corporation, supra.*

Smith contends, however, that his duty to supplement was fulfilled by the description of Dr. Freston's proposed testimony provided in his supplemental pretrial submission. Smith asserts that this, combined with the alleged Wyoming custom and practice of allowing treating physicians to testify concerning causation of injuries militates against any finding of prejudice to Ford. Any surprise which may have occurred, argues Smith, was avoidable, had Ford simply taken the deposition of Dr. Freston.

■■■■ Rule 16, Fed.Rules Civ.Proc., 28 U.S.C.A., authorizes the district courts to hold pretrial conferences designed to aid in the disposition of cases, and enter orders subsequent thereto which "control . . . the subsequent course of the action, unless modified at trial to prevent manifest injustice." "The office [of the pretrial order] as a procedural tool [is] to insure the economical and efficient trial of every case on its merits without *chance or surprise.*" [Emphasis supplied]. *Case v. Abrams,* 352 F.2d 193, 195 (10th Cir. 1965). It "measures the dimensions of the lawsuit, both in the trial court and on appeal." *American Home Assur. Co. v. Cessna Aircraft Co.,* 551 F.2d 804, 806 (10th Cir. 1977), *quoting, Hodgson v. Humphries,* 454 F.2d 1279, 1281 (10th Cir. 1972). The "amendment of a pretrial order formulating issues [or designating witnesses and their proposed testimony] will be permitted during trial *only if necessary to prevent manifest injustice.*" [Emphasis supplied]. *Keen v. Detroit Diesel Allison,* 569 F.2d 547, 554 (10th Cir. 1978). The burden of establishing such manifest injustice falls squarely on the moving party. *Seneca Nursing Home v. Secretary,* 604

F.2d 1309 (10th Cir. 1979). When there exists a "properly drawn, detailed pretrial order, a trial court's determination that certain facts or issues must [or should not] be excluded from trial on the basis of a pretrial order may be reversed only if there is an abuse of discretion. *See James v. Newspaper Agency Corp.,* 591 F.2d 579, 583 (10th Cir. 1979) (pretrial order specifying the witnesses to be called may be used to bar the calling of unlisted witnesses)." *Trujillo v. Uniroyal Corp.,* 608 F.2d 815, 817–818 (10th Cir. 1979).

Pursuant to rule 83, Fed.Rules Civ.Proc., 28 U.S.C.A., the District Court of Wyoming, as well as many other district courts, has adopted rules implementing the pretrial conference procedure broadly covered by rule 16, Fed.Rules Civ.Proc., 28 U.S.C.A. Rule 8, Rules of the United States District Court for the District of Wyoming [hereinafter cited as local rules], deals exclusively with pretrial procedure. Rule 8(a) of the local rules deals with "pre-trial scheduling conferences" and provides that the parties shall:

(2) Exchange a list of all witnesses to be called at the trial, together with a brief summary of their proposed testimony. No testimony shall be received at the trial unless it be consonant with such summary and from a witness so designated, except for purposes of rebuttal or by order of the court upon the showing of good cause why the name of the witness and the summary of his testimony was not disclosed at said pre-trial conference. *Generalized summaries are not acceptable.* Additional witnesses and summaries of testimony shall be submitted by each party to the opposing party as their names and addresses are ascertained, and at the final pre-trial conference. [Emphasis supplied].

Rule 8(e)(1) also requires the parties, in connection with the final pretrial conference, to submit a memorandum with a "list of the names and addresses of the witnesses whom the parties intend to call to testify at the trial, together with a brief summary of the testimony intended to be elicited from

each witness in the trial . . ." The language of Rule 8(e)(3) spells out the sanctions for counsel's failure to comply with the rule: "Except for impeachment or rebuttal purposes and absent good cause shown, no . . . witness [shall] be permitted to testify unless his name and address appear on the witness list, together with a summary of his testimony as required by this order."

Rule 8 also advises counsel who draft pretrial orders to follow Appendix D to the Rules. Appendix D is a form of pretrial order which includes the following pertinent language:

This pre-trial order has been formulated after conference at which counsel for the respective parties have appeared. Reasonable opportunity has been afforded counsel for corrections or additions prior to signing by the Court. Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice. . . . [6]

■■■■ Such local rules of practice, as adopted by the district court, "have the force and effect of law, and are binding upon the parties and the court which promulgated them until they are changed in appropriate manner." *Woods Construction Co. v. Atlas Chemical Industries, Inc.*, 337 F.2d 888, 890 (10th Cir. 1964). Considerable deference is accorded to the district courts' interpretation and application of their own rules of practice and procedure. *Martinez v. Thrifty Drug and Discount Co.*, 593 F.2d 992 (10th Cir. 1978); *Lance, Inc. v. Dewco Services, Inc.*, 422 F.2d 778 (9th Cir. 1970). Where, however, we are "convinced that the district court has misconstrued its own rules", reversal may be warranted. Wright and Miller, *Federal Practice and Procedure*, Civil § 3153. *See also, Golgrove v. Battin*, 413 U.S. 149, 161 n. 18, 93 S.Ct. 2448, 2455 n. 18, 37 L.Ed.2d 522 (1973).

A comparison of the description of Dr. Freston's testimony in plaintiff's pretrial memorandum, with Dr. Huelke's testimony

in Ford's pretrial memorandum, is instructive. Ford described its witnesses as follows on July 21, 1977:

Defendant does not anticipate that it will call witnesses other than a Ford engineer (either Everett Kennedy and/or Louis Tubben) and Dr. Donald Huelke. . . . Dr. Huelke is expected to testify to anticipated injuries to be expected from an accident of the type in question and compare the same to the injuries in fact sustained by the plaintiff. In connection therewith, Dr. Huelke may be asked to testify as to the speed of the vehicles involved, the force of the crash, the movement of the body of the plaintiff during the crash, and the like. Ford is advised that plaintiff intends to call Mr. Richard Crawford of Ponderosa Associates, and depending upon the nature of his testimony may call an accident reconstruction expert.

[App., Vol. I, at p. 22].

Despite the rather specific statement that Dr. Huelke would testify as to the relationship between the accident and plaintiff's injuries, plaintiff described his last four witnesses on January 24, 1978, as follows:

5. Dr. William Brohm, Riverton, Wyoming, will testify as to the medical care given to the Plaintiff and as to his current condition, as well as his prognosis. (This witness has been deposed.)

6. Dr. Donald Gullickson, Lander, Wyoming, will testify as to subsequent medical care rendered to the Plaintiff, as well as to his prognosis.

7. Professor Richard Crawford, Louisville, Colorado, will testify as to the design defects and failures of the right seat and the right seat compartment of the vehicle in question.

8. Dr. Freston, University Hospital, Salt Lake City, Utah, will testify as to his medical treatment of the Plaintiff, as well as to his prognosis.

[App., Vol. I, at p. 72].

There is no question, in our view, that the description of Dr. Freston's testimony in

---

**6.** This language does not appear in the final pretrial order entered in this case.

the supplemental pretrial submission, later incorporated in the final pretrial order [R., Vol. I, p. 112], related solely to plaintiff's injuries and prognosis *and not to* the causal relationship between those injuries and defective lap belts.

In *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894, 904–905 (3d Cir. 1977), the court enunciated a series of factors which should be considered in determining whether a district court has abused its discretion in excluding, or in our case allowing, testimony not specified in the pretrial order: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order." We address each of these factors separately.

*1. Prejudice or Surprise in Fact.*

In our opinion, it is noteworthy that Dr. Freston's testimony is described almost identically to that of Dr. Gullickson and Dr. Brohm. Each of these latter witnesses was deposed by Ford and each was specifically asked whether he had any opinion regarding the relationship of plaintiff's injuries and the alleged deficient design or manufacture of the automobile. Each was also asked whether he had made a study of the seat belt syndrome or read any literature in the area. Each replied in the negative to these questions. [Gullickson dep., R., Vol. XVIII, at pp. 21–22; Brohm dep., R., Vol. XXI, at pp. 12–15]. Ford knew these doctors were experts only in their fields of medicine. Thus, the addition of Dr. Freston to the list of witnesses, with the same general description of his testimony, could only have misled Ford into believing that his testimony would relate solely to plaintiff's injuries and not to their relationship to a defective seat belt. Assuming that the pre-

trial order was not designed to be misleading, the fact remains that such was its effect,[7] and that it prejudiced Ford in the preparation of its defense. *See Ante* at p. 794.

■ Our view is not altered by Smith's contention that Wyoming custom and practice routinely allows treating physicians to testify as to the causation of injuries. We discern no major variance between Wyoming practice and this Court's decisions concerning the admissibility of evidence not properly disclosed to the opposing party either in pretrial proceedings or in response to properly framed discovery requests. *See Western Fire Insurance Co. v. Tim Force Tin Shop, Inc.*, 599 P.2d 540 (Wyo.1979); *Chrysler Corp. v. Todorovich, supra; Ford Motor Co. v. Kuhbacher*, 518 P.2d 1255 (Wyo.1974). In any event, the custom and practice in Wyoming is irrelevant. The Federal Rules of Civil Procedure control this diversity action even where there exists a conflict. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). *See also, Walker v. Armco Steel Corp.*, —— U.S. ——, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). These rules, of course, were designed to make pretrial and discovery uniform across the country and to *prevent* "trial by ambush".

Parallel arguments that such custom and practice obviates a finding of surprise and therefore prejudice are also unpersuasive. First, we find nothing in the record countering Ford's claim of surprise and prejudice. Second, Ford was entitled to rely on the summary of testimony provided in the supplemental pretrial submission. The fact that Wyoming practice imputes such constructive knowledge, if indeed such is the practice, is not sufficient.

Even if plaintiff [or defendant in this case] had reason to believe that such testimony would be presented . . ., which is at best sharply disputed, that would not justify the failure . . . to respond truthfully and completely to a properly framed interrogatory. "It is no

7. Perhaps this explains why Ford excluded Drs. Volk and Gainsford from their motion to strike

recently named witnesses made on the basis of inadequate time for discovery prior to trial.

objection to interrogatories . . . that the information sought is within the knowledge of the interrogating party." *Bowles v. Safeway Stores*, 4 F.R.D. 469, 470 (W.D.Mo.1945); *Grand Opera Co. v. Twentieth Century-Fox Film Corp.*, 21 F.R.D. 39, 40 (E.D.Ill.1957). "A distinction should not be drawn between facts with or without the knowledge of the examining party." 4 Moore's Federal Practice para. 26.59 at 26–219 (2d Ed. 1974).

Consequently, to characterize the issue here as being determined by a lack of "surprise" distorts the essential problem. The policy which prompted amendment to Rule 26(b)(4) of the Federal Rules of Civil Procedure to allow more liberal discovery of potential expert testimony was not merely for convenience of the court and the parties, *but was intended to make the task of the trier of fact more manageable by means of an orderly presentation of complex issues of fact.* "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). See generally F.R. Civ.P. 26(b)(4), Advisory Committee Notes to 1970 Amendments.

In this case the expert testimony was crucial. As Judge Bartels has well put it: "Realistically speaking, the resolution of the entire case depends upon [medical] and expert testimony and opinion. The necessities of such a case transcend the usual limitations which may otherwise be imposed upon discovery proceedings." *United States v. Nysco Laboratories, Inc.*, 26 F.R.D. 159, 162 (E.D.N.Y.1960).

*Weiss v. Chrysler Motors Corp., supra*, at pp. 456–457. [Emphasis supplied].

*See also, Coleco Industries, Inc. v. Berman, supra*, (evidence of accounting study not disclosed to opposing party in pretrial properly excluded); *Voegeli v. Lewis, supra*, (expert witness' change of opinion was not admissible where it was not disclosed in advance of trial); *Tabatchnick v. G. D. Searle, supra*, (testimony of proposed new expert excluded where opponent was unfairly prejudiced).

The critical nature of Dr. Freston's testimony convinces us that Ford was prejudiced in the presentation of its case. Dr. Freston not only testified that plaintiff's injuries were caused by the seat belts; he also testified that in his opinion, based on the article he had read, the injuries were caused by a *defective* seat belt. [App., Vol. II, at pp. 271–274]. A review of the article on which Dr. Freston based his opinion [Appellee's br., App. I], makes it abundantly plain that no inference about injuries from defective seat belts, as opposed to properly functioning seat belts, can be drawn because the study did not have that type of information unless the belt actually broke or was torn by the force of the accident, which did *not* occur here. This is in contrast to Dr. Freston's testimony that the study examined only users of *properly functioning seat belts* and that based on data derived therefrom, the odds of pancreatic injury are only "about one in a thousand". [App., Vol. II, pp. 311–312]. Thus, Dr. Freston left the impression with the jury that Smith's seat belt was not functioning properly.

If Ford had been apprised in advance of Dr. Freston's testimony, it could have taken his deposition, discovered the article, and been well prepared at trial to cross-examine him about his conclusions.

### 2. Ability to Cure.

The challenged testimony provided crucial, non-cumulative evidence on the question of whether a *defective* seat belt aggravated or enhanced the plaintiff's injuries. This, of course, supplied the proof of a key element of Smith's theory of recovery. *Larsen v. General Motors Corp., supra; Fox v. Ford Motor Co., supra.* Without it Ford would possibly have been entitled to a directed verdict. The evidence was elicited from the first witness to appear before the jury—magnifying its impact. Dr. Freston was scheduled for examination only on the day he appeared. Counsel for Smith completed his direct examination at 4:43 p. m.

Ford requested and was allowed only eleven minutes to prepare for cross-examination. The *Garrett and Braunstein* article was not available for his use prior to cross-examination.

We have previously observed that the Federal Rules of Evidence contemplate that the "full burden of exploration of the facts and assumptions underlying the testimony of an expert witness [falls] squarely on the shoulders of opposing counsel's cross-examination." *Graham, Part One* at p. 897. "Before an attorney can even hope to deal on cross-examination with unfavorable expert opinion he must have some idea of the basis of that opinion and the data relied upon. If the attorney is required to await examination at trial to get this information, he often will have too little time to recognize and expose vulnerable spots in the testimony." *Friedenthal*, at p. 486. Finally, proper impeachment or rebuttal may have required advance knowledge so that Ford's own experts could have been consulted.[8]

■ Dr. Freston's scheduled departure the following day combined with the challenged testimony's revelation in the midst of trial significantly impaired Ford's ability to cure the prejudice. This was magnified by Dr. Freston's use of an empirical study not disclosed in advance of trial. Ford, of course, could have asked for a continuance in which to prepare, but given Dr. Freston's appointment the following day in Detroit and the nature of the testimony, adjournment may well have constituted a significant disruption in the trial of the case.[9]

For these reasons, we hold that Ford's ability to cure the prejudice was significantly impaired.

### 3. *Disruption of the Trial Process.*

Dr. Freston's testimony was revealed in the midst of trial. An adjournment for depositions, when considered in light of the subject matter of the testimony and Dr. Freston's other scheduled appointments, would have resulted in a significant disruption of trial. Proper rebuttal and impeachment undoubtedly would have required the consultation of other experts and, perhaps, the enlistment of new personnel or empirical data. A short continuance, such as that allowed, while not disruptive, was inadequate. The crucial nature of the testimony required more. *See, Coleco Industries, Inc. v. Berman, supra,* at 576–577 n. 14; *Voegeli v. Lewis, supra.*

### 4. *Bad Faith or Willfulness.*

■ Although there was an allegation of bad faith and willfulness imputed to counsel for Smith, [App. A, p. 4], we cannot consider it inasmuch as the trial court did not make findings in this regard. *See, Ager v. Jane C. Stormont Hospital,* 622 F.2d 496 (10th Cir. 1980). Furthermore, we do not deem remand for consideration of this point necessary. As stated in *Coleco Industries, Inc. v. Berman, supra,* at pp. 576–577 n. 14 "Here, as in *Meyers [Meyers v. Pennypack Woods Home Ownership Ass'n., supra],* there was no explicit finding of willfulness or bad faith. Nonetheless, unlike *Meyers,* no explanation was proffered for the failure to inform defense counsel of the [nature of the challenged testimony] prior to trial."

Despite our analysis, we seriously question whether bad faith or willfulness has an application to this issue. While it may prove aggravated circumstances, this would

---

8. Dr. Huelke did address Dr. Freston's interpretation of *Garrett and Braunstein.* We believe however that such rebuttal did not ameliorate the prejudice presented as effectively as direct impeachment through cross-examination could have.

9. We reject any suggestion that prejudice did not occur or that it could have been cured on the grounds that "even if [defendant's] counsel [was] surprised by *who* gave the testimony, he should not have been surprised by its sub-

stance." *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1202 (3d Cir. 1978). It simply was not the responsibility of Ford to second guess Smith's witnesses' descriptions in his supplemental pretrial submission. On this basis, and the similarity between the description of Dr. Freston's testimony and other witnesses already deposed, we cannot hold that Ford had a duty to "police" or "doublecheck" Smith's pretrial witnesses' description, on which Ford had every right to rely.

not necessarily create greater prejudicial impact than a negligent act not in conformance with pretrial procedure. The issue, on appeal, must be analyzed from the point of view of the prejudiced party, not vice versa.

### C.

#### *Conclusion*

■ Balancing these factors against the wide discretion accorded the district court in both the discovery and pretrial area, we hold that Ford suffered such prejudice as requires the case to be reversed and remanded for new trial.

REVERSED AND REMANDED.

### APPENDIX A

THE COURT: What is your objection, Mr. Greenlee?

MR. GREENLEE: Your Honor, it seems that Gerry never fails to come up with a surprise, and he has done it again.

Dr. Freston first saw Mr. Smith in January of this year. He was first listed in the Supplemental Pretrial Memorandum of the plaintiff's. In that Supplemental Pretrial Memorandum, and in this list of witnesses, they tell me in January, less than two months to the trial, Dr. Freston, University Hospital, Salt Lake City, Utah, will testify as to his medical treatment of the plaintiff, to which I have no objection, as well as to his prognosis, to which I have no objection.

Now, they are now inquiring into the causes behind his injury, and they are doing it in such a way that the witness is going to say, "Yes, I have made a study of seat-belt injuries and these injuries are inconsistent with," or "consistent with"—I'm not sure what he's going to say because they haven't defined—

THE COURT: Did you take a discovery deposition?

MR. GREENLEE: No, sir, there wasn't time. You know, we are a month and a half away from trial, they tell me all he's going to testify to is how he has treated the plaintiff and how he is going to treat him in the future.

That, you know, we admit Mr. Smith was injured. There is no question about that. I don't have any problem, and you haven't heard one objection from me on this witness until this point in time. I certainly would have—

THE COURT: I think you admitted he was injured in the accident, didn't you?

MR. GREENLEE: Yes. Yes, he was. But now they are trying to pinpoint, you see, those injuries. Now that's unfair.

THE COURT: Do you contend that pancreatitis occurred in some other region?

MR. GREENLEE: The pancreatitis occurred because the various organs in the abdominal cavity were injured when Smith was violently thrown forward, the inertial forces created by that accident caused those organs to rip and tear loose and to bang into each other in the abdominal wall and whatnot.

They were not caused, we contend, by direct application of force from the seat belt, which is where the plaintiff wants to go with this witness.

THE COURT: What is the basis of your objection, Greg? Is it because you are claiming the doctor is speculating?

MR. GREENLEE: Well, that's one. The first objection is, their listing of this doctor had nothing to do with what they are now calling him to testify to, to wit, the causes of the injury. That's not in here.

They simply talk about treatment, past treatment and future treatment. And so it's a surprise to me.

I haven't had a chance to prepare, I haven't had a chance to take a deposition. I didn't take a deposition because there was no indication here that he would be so called to testify.

Second of all—

THE COURT: Let me say this. He did just testify that the overwhelming weight of the facts—I think is the way he phrased it—was that the injuries resulted from the accident.

MR. GREENLEE: I don't have any problem with that. I do not dispute that the pancreatic problems arose from the accident.

But now they want him to go further and say what specifically in that accident caused that injury. And that I object to because I have had no opportunity to prepare, I'm surprised, and, furthermore, in the five-year period the doctor is speculating.

THE COURT: Is that the bulk of your objection?

MR. GREENLEE: That's the bulk of it.

THE COURT: Gerry?

MR. SPENCE: Judge, he says he's surprised. I guess I'm more surprised than he is because I have never been into a court of law in my life but what the medical doctor was asked to give a causal opinion as to the cause of the injury.

That goes without saying. Medical doctors have to give some testimony.

You know, if you don't they would say, "This man isn't qualified"—as soon as they put Crawford on they will say, "Well, he isn't a doctor," and ask him what he thinks caused the injuries. You watch and see what kind of an objection we get there.

I do admit that we are out of order, and I do tell you we will tie it in with other evidence. But he is here and we have the intent of having him testify as to his opinion based upon reasonable medical probability as to the cause of these injuries and the mechanism involved.

THE COURT: With regard to the surprise, I'm going to allow the witness to testify on this. I think that what you are really saying, Greg, is that under our system of telling each other what a witness is going to testify to is a bad system, and I agree to that.

Ever since the Federal Rules were adopted in this state, we have basically, in listing witnesses in pretrial memoranda, have said as little as we could about what they would really testify to.

\* \* \* \* \* \*

But I agree, you are basically right. We should do it better. We haven't. It hasn't been our custom.

I'm going to try to make it better, but we haven't objected here. So I don't see where we can really truthfully claim surprise here, because, as Mr. Spence says, I do think that we have gone into this question as to the causal condition with doctors always.

Now, as to your second objection on foundation, I'm not sure yet, I haven't heard all the foundation, I don't know whether—I can't say whether Dr. Freston is speculating or not. The foundation isn't complete. So I can't rule on that.

MR. MORIARITY: Greg can cross-examine on that point.

MR. SPENCE: He has the right to voir dire.

MR. GREENLEE: I have not had the opportunity to examine him before. You know, it's extremely scary when you get a witness that you've never ever talked to.

I shook his hand for the first time in this courtroom after lunch.

MR. SPENCE: I have never seen any of yours.

MR. GREENLEE: But their depositions were taken by your people.

MR. SPENCE: Some of them were and some weren't.

MR. GREENLEE: It seems to me that this is a critical issue to the defendant's defense. Now, certainly I can get up there and ask him, "Doctor, what about these seat-belt injuries and what not," but all I'm doing there is compounding the problem that I already have.

Your Honor, I try to be fair with listing what my people are going to say and try to include those areas, all of those areas that they are expected to be called upon to testify to. That was not done in this case.

I submit to you that it was an intentional—

MR. SPENCE: On, Greg, don't say that.

MR. GREENLEE: —an intentional withholding of information from me on which I would have reacted entirely differently had they said "and the causes of his injuries."

THE COURT: Basically, you see, I'm ruling that the tail goes with the hide. You let without objection in the doctor's testimony it was attributable to the accident.

"What is the cause of his pancreatitis?"

"The accident was."

All right. You've got that in and there's no objection. Now here is a refinement of that and I just basically think that that's what it is, is a refinement of it. That's why I say it's something that maybe we're at fault in not requiring that pretrial memoranda in greater detail.

But basically I think that has not been the Wyoming practice, and I think we will have to live with it, at least in this case. Gentlemen, let's move.

WILLIAM E. DOYLE, Circuit Judge, dissenting.

The sole issue which is relied on by the majority for reversal is whether an alleged trial error consisting of the giving of an incomplete or general statement as to the testimony of a proposed expert witness, in conjunction with the naming of the witness in the plaintiff's pretrial statement, can justify the reversal of a judgment rendered following a lengthy and difficult trial and the award of a highly substantial verdict. There is not the slightest contention that the evidence is insufficient or that the claim is ill founded. Nor does it appear that the defendant made any effort by deposition or other means to obtain a detailed statement of the proposed testimony of the expert.

Some preliminary elements need to be delineated:

### A.

### JUSTICE DELAYED

These injuries occurred in 1973. There was a prior trial involving the wrongful deaths of the wives of the plaintiff Smith and the driver of the automobile in question, Mr. Fox. Here, we are well into the year 1980, and the end is not in sight. At the new trial there would not be any great difference, if any, in the facts. At the retrial either the testimony of Dr. Freston in person or his former testimony given at the trial below will be offered. It boils down, then, to whether or not the plaintiff is to be punished to this extent because of the action of his lawyer in not detailing the projected testimony of Dr. Freston rather than merely describing it in general terms. Note also that this is not a case in which there was a failure to endorse the name of a witness, as a result of which surprise was claimed by Ford at the trial. We expect to show that there was no surprise in fact, conceding that the statement was not full and complete.

### B.

### SURPRISE IN FACT IS NOT DEMONSTRATED

Ford maintains that it had only 1½ months to prepare itself, and thus its failure to take a deposition should not be counted against it. This is incorrect. The witness in question, Dr. James W. Freston, was in fact endorsed not quite 2½ months prior to the trial in late March. This notice was given at a supplemental pretrial conference held on January 24, 1978. Does the time span of not quite 2½ months prior to trial constitute a justification for failing to probe the details of Dr. Freston's testimony? Counsel for Ford were aware of the fact that the plaintiff, Mr. Smith, was, at that very time, being treated by Dr. Freston and was in personal contact with Dr. Freston. Certainly, this was worthy of some inquiry. But, counsel for Ford made no move, formal or otherwise, to ascertain the details. Granted, the notice was cryptic and conclusory. This raises the question whether it is permissible in an adversary proceeding such as this for the attorney for the defendant to ignore a notice which gives the name and general nature of the testimony of an expert and to run the risk incident to not making inquiry as to the details of the testimony, notwithstanding that a mere demand submitted to the judge would have compelled the plaintiff's lawyer to reveal in every detail the proposed testimony of the expert. Thus, it would not

have been necessary for Ford to take a deposition. Certainly, it was hazardous in a case of this magnitude for Ford's counsel to elect to run the risk of having to cope with damaging testimony for which no specific preparation had been made (so it is claimed). Of course, there had been preparation. Ford had brought in an expert from the University of Michigan Medical School, Dr. Huelke, who was fully prepared to refute any testimony dealing with the seat belt as a cause. Perhaps this latter fact accounts for Ford's decision not to pursue the deposition.

The doubling of the damage demand by counsel for Smith to one million dollars, which took place virtually simultaneously with the listing of the witness, gave added notice to Ford that plaintiff did not believe that there existed a void in the testimony.

Accordingly, we have a setting in which a case had been carefully prepared over a long period of time and which was in the last weeks of preparation. The issues were fully understood. Ford knew about the problem of cause as applied to the seat belt because the main deficiency relied on by the defendant was this specific element. Also, Ford was prepared to meet this issue. The fact that Ford was ready detracts from the claim of Ford that it was surprised.

The witness who was endorsed, Dr. Freston, was not any ordinary internist. He was an expert in the particular field and in this particular part of internal medicine. He had not only an M.D. degree, but a Ph.D. as well, and he was Chairman of an important department of the University of Utah Medical School. Surely none of this was ignored by Ford.

## C.

### THE IMPORTANCE OF THE TRIAL COURT'S FINDING

A third factor which is entitled to be weighed is the finding of the trial court that surprise did not exist. In view of the specialty of Dr. Freston and the peculiarly serious injuries of Smith, including extensive injuries to the pancreas, which could be fatal, and removal of the spleen, there was good reason for counsel to be generally aware of the foregoing testimony and to expect testimony as to causation. This issue was anticipated of each of the other medical witnesses who were deposed.

## D.

### FORD'S ELECTION NOT TO OBJECT WHEN DR. FRESTON WAS ASKED A GENERAL QUESTION ABOUT PROXIMATE CAUSE

A timely objection to the testimony of this witness was not given. Counsel waited until Dr. Freston had testified to one phase of proximate cause, that which had to do with the automobile collision as a cause of the injuries which were the subject of the lawsuit. Objection was not made until the question of cause as it related to the seat belt was introduced. Only then did counsel for Ford claim surprise. The trial court considered this a waiver of objection.

## E.

### SURPRISE WAS NOT ESTABLISHED

Finally, the trial court had lived with this case and the predecessor. Having worked closely with the lawyers, the judge was in a good position to make a finding on the existence or nonexistence of surprise. Not a scintilla of evidence on the subject of surprise was offered by Ford. No detailed inquiry was conducted, no witness was presented, and so the reversal rests on an analysis by the majority of the circumstances surrounding this incident to the extent that they are able to squeeze favorable inferences from the basic facts, plus the mere *claim* that was made by counsel. This isn't much.

The circumstances at the trial do not bespeak surprise. Not only was it brought out that Dr. Donald F. Huelke, Ford's expert witness, was fully prepared on the general subject of seat belt cause, he was also ready to refute the testimony of Dr. Freston that the position of the seat belt produced the serious internal injuries. Dr.

Huelke was even familiar with the Garrett and Braunstein article (the literature on which Dr. Freston relied).

The case of *Tupman Thurlow Co. v. S. S. Cap Castillo*, 490 F.2d 302 (2d Cir. 1974), considered whether the party claiming surprise was prepared to cope with the evidence to which objection was made, which fact was considered pertinent in deciding whether in fact there was surprise.

\* \* \* \* \* \*

The preliminary facts which are stated raise a question as to why Ford refrained from deposing Dr. Freston, and whether Ford should be allowed to refrain from making any effort to ascertain the details of the testimony of an expert who is listed and to rely entirely on the initiative of the plaintiff in bringing each and every detail to its attention. Ford would say that it was so misled by the statement that it did not consider it necessary to act. This ignores the complexity of the case, for example, the fact that the causation issue was foremost in the minds of both lawyers. A distinguished physician was named and thorough preparation required every possibility to be examined. Is it unnecessary for the adversary party to take obvious steps to protect its position? Neither side should, consistent with the spirit of the rules, be allowed to sit back and fail to take obvious action to ascertain facts. To fail to do so suggests an attempt to use the rules for the object of developing an error. The trial court was of the view that neither side was genuinely surprised, that each was trying to outmaneuver the other. If this was the case, there should not be a reversal because this punishes the innocent litigant.

The important guide to the duty to supplement requests for discovery is subsection (e) of Rule 26, an amendment which was added in 1970. It states that "A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response" except in two instances: 1) where the question is addressed to the identity and location of persons having knowledge of discoverable materials; 2) to identify each person who expects to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.[1]

Professor James Moore in his Treatise, Moore's Federal Practice Section 26.81, explains the purpose of the amendments:

> Subdivision (e) of Rule 26 was added in 1970 to end the uncertainty that had developed over the duty to supplement. This provision imposes directly the duty to supplement answers to interrogatories seeking the identity and location of persons having knowledge of any discoverable matter, and answers to interrogatories seeking the identity of persons expected to be called as expert witnesses at the trial and the substance of their expected testimony. Further, when a party who has answered interrogatories discovers that the answers were incorrect when given, he has a duty to amend them to conform to the truth.

> Along the lines suggested by Judge Ellis in *Gorsha [v. Commercial Transport Cpr.,* 38 F.R.D. 188 (E.D.La.1965)], the subdivision also provides that under circumstances in which failure to provide subsequent information would be *"in substance a knowing concealment"* there is a duty to supplement the answer though it was correct when made.

> Flexibility is provided by a provision in subdivision (e)(3) that the duty to supplement answers may be imposed by the court or by agreement of the parties. Of course the parties are free to serve new interrogatories requesting supplementation of the answers to the earlier set. (Emphasis supplied.)

---

1. The text of Rule 26(e)(1) is as follows:

 (1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter in which he is expected to testify, and the substance of his testimony.

Does the majority opinion impose an absolute and *exclusive* duty on a party to supplement answers to interrogatories or to amend them? It does this and more. The failure to detail the testimony, according to the majority, can be likened to an offense *Malum in se*. It calls for imposition of the extreme penalty regardless of whether surprise, prejudice or willfulness is established.

The First Circuit in *Simonsen v. Barlo Plastics Co., Inc.*, 551 F.2d 469 (1st Cir. 1977), considered the consequence of plaintiff's failure to disclose the complete substance of an expert witness's testimony. It held that the consequence was within the trial court's discretion. The plaintiff in *Simonsen* had not given notice that his expert would testify to permanent unemployability of the plaintiff. The defense sought a recess in order to find a vocational rehabilitation expert. The trial court denied the motion seeking delay and the First Circuit affirmed. The court said:

PSCo argues that it should not be bound by the pretrial order as it was surprised by testimony of plaintiff's expert, Arthur Kenison, that Simonsen might be permanently unemployable. . . . At the time the list of expert witnesses was filed, Simonsen is said to have been working on and off as a truck driver so that PSCo had no reason to anticipate any need for testimony about vocational rehabilitation. However, PSCo was informed over five months prior to trial that Kenison would be testifying as an expert and, *through discovery*, could have ascertained the substance of his testimony. . . . Moreover the complaint had alleged permanent disability. Clearly the court did not abuse its discretion in refusing to hold up the progress of the trial for the testimony of the unlisted and as yet unlocated expert. (Emphasis supplied.)

551 F.2d at 471.

*Simonsen* thus places the burden on the defendant to take the initiative by deposing the witness—just the opposite of the position taken by the majority here.

The situation is far different where the expert witness is unknown and an effort is being made to call him after having failed to name him. *See Davis v. Duplantis*, 448 F.2d 918 (5th Cir. 1971). But in that case the trial judge allowed the expert to testify notwithstanding failure to list his name as a witness in accordance with the pretrial order. The Fifth Circuit upheld the ruling, noting the severity of the sanction which denies the testimony. Thus, the court weighed the consequences of precluding the calling of the witness against the magnitude of the violation of the rule and decided that the discretion of the trial court should be upheld. The Fifth Circuit was also persuaded by the fact that the plaintiff's counsel knew that the doctor was a potential witness since he had been furnished a report before the trial and had had an *opportunity* at that time to depose him.

The Seventh Circuit has also had occasion to rule on the subject of failure to name the witnesses where knowledge of expertise was not discovered until time of the trial. *See Sadowski v. Bombardier Ltd.*, 539 F.2d 615 (7th Cir. 1976). The witnesses in that case had been listed in the pretrial order, but had not been listed as experts. The court noted that the question was a close one, but observed that the testimony became significant during the trial and this tended to excuse the lateness of their being treated as experts. Again, the exercise of the trial court's discretion was upheld.

This court had occasion to consider the admissibility of material which had not been disclosed in a supplement to a response given in answer to an interrogatory required by Rule 26(e) in *Price v. Lake Sales Supply R.M., Inc.*, 510 F.2d 388 (10th Cir. 1974). We stated:

It is quite true that parties are under a continuing duty to supplement their responses. See 4 J. Moore, Moore's Federal Practice [Section] 26.81 (1970). Rule 26 clearly requires this. There is no indication, however, that the trial court believed that this failure to amend was a knowing concealment. In any event, it is questionable whether exclusion is the only proper penalty for failing to comply with the requirement. Surely the trial

judge has some discretion in selecting the sanctions and it does not appear that the court abused its discretion in this instance.

510 F.2d at 395. We thus recognized in that case the importance of the fact that there was a lack of evidence showing a knowing concealment. It was also recognized that the use of the exclusion sanction was questionable and that the trial judge should have some discretion in selecting sanctions and that in that instance there was no reason to conclude that there had been an abuse of trial court discretion.

The majority opinion cites, among other cases, the Fifth Circuit's decision in *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978). In that case the trial court's discretion was determined to have been improperly exercised in allowing the testimony of plaintiff's expert witness, which testimony connected the plaintiff's back injuries to an accident on a defective step and also connected a heart attack to the same accident. The evidence of the causal connection of the heart attack arose on the date of the jury selection. It is understandable that the testimony in the *Shelak* case, considering the date on which it arose, and the nature of it, justified the trial court's decision that it should be rejected. However, even in that extreme situation, there was a divided court. Judge Rubin dissented on the ground that the trial court's discretion in allowing the evidence should have been upheld. In the *Shelak* case the trial court had also allowed a witness to testify who had not been named. The Fifth Circuit ruled that receipt of this evidence was not reversible error because it did not appear that there was surprise and thus prejudice. *See* 581 F.2d at 1159. Thus, the *Shelak* case is at odds with the proposed opinion in this case, which holds that it was error for the trial court to allow Dr. Freston to testify even in a situation in which surprise was far from clear.

*Weiss v. Chrysler Motors Corporation*, 515 F.2d 449 (2d Cir. 1975), is relied on by the majority as upholding the right of a reviewing court to void the exercise by the trial court of discretion on a matter such as is presented. It is to be noted, however, that the *Weiss* case involved broad and general notice as to what the witness was going to testify to. Actually, the Second Circuit in the *Weiss* case ruled that this was not reversible error. The case was reversed for error in refusing to admit proffered evidence in rebuttal, which evidence was admissible as a matter of right and which did not become pertinent until the rebuttal. 515 F.2d at 458, 459.

The majority opinion also relied on the case of *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir. 1977), a malpractice case in which one of the expert witnesses for the defense changed his testimony between the time of his deposition and the time of trial. The defense had demanded through interrogatories the nature of the testimony which was being offered. The answers were inadequate and the court granted a motion to compel answers, but, again, the answer was inadequate and misleading. A second set of interrogatories was denied enforcement by the court. Also, the court allowed the defendant to call another expert witness, although, previously, counsel for the defendant had indicated that he would not be called, as a result of which there had not been voir dire examination of the jury concerning the witness. The Court of Appeals for the Eighth Circuit reversed the case and remanded it to the trial court, saying that there had been an abuse of discretion by that court growing out of the trial court's having failed to enforce its original order compelling answers to interrogatories in the case of one of the experts who changed his testimony. The court said, in addition, that the plaintiff was deprived of the opportunity to voir dire with respect to the other expert. *Voegeli* is so complex and different from the case at bar that it is not an effective authority in this case, which is limited to an objection to allegedly surprise expert testimony, the substance of which was claimed to have produced surprise.

There is one other complaint by the majority and that is that Ford was allowed only 10 minutes to prepare cross-examination. The majority does not mention the fact that the 10 minutes was all that was

requested. Moore's Federal Practice paragraph 59.08[2] states that the surprised party should move for a continuance at the time of the surprise or otherwise he will be considered as having waived his objection. The cases cited by Moore are *Jackson v. MFA Mut. Ins. Co.,* 169 F.Supp. 638 (W.D. Ark.1959); *Campbell v. District of Columbia,* 153 F.Supp. 730 (D.D.C.1957), *aff'd* 254 F.2d 357 (D.C.Cir.1958); *Dow v. Carnegie-Illinois Steel Corp.,* 70 F.Supp. 1016, 1019 (W.D.Pa.1947), *rev'd on other grounds,* 165 F.2d 777 (3rd Cir. 1947); *Beardsley v. Howard & Bullough American Mach. Co.,* 176 F. 619 (C.C.D.R.I.1910). *Cf. Tabatchnick v. G. D. Searle,* 67 F.R.D. 49 (D.N.J.1975).

In summary:

The finding of the trial judge that surprise was nonexistent is of high importance for these reasons:

1) The cases show that actual existence of surprise is essential. Also necessary is, of course, prejudice.

2) Constructive surprise, as discussed in the majority opinion, without more, surely is not enough. Surprise implied in law will not suffice. The surprise must be real.

3) The evidence of surprise is meager. There exists, of course, the claim made in open court by Ford's counsel, but this is not evidence. It is merely an allegation. If, indeed, this seasoned and experienced trial lawyer was surprised, that indeed would be surprising given the exposure that he has had in this case. In fact, both sides have lived with the case for many years and they were sensitive to the issue of seat-belt-cause alleged by plaintiff and defended by Ford. Both sides knew that plaintiff had to come forward with evidence establishing that the seat belt caused the harm. Furthermore, the conduct of counsel for Ford during the trial showed that he was alert to the issue and indeed apprehensive about the special testimony of Dr. Freston on the subject, for he was quick to distinguish between general causation and the specific causation involved here.

In the face of the foregoing, how can the majority demonstrate the plain error necessary to a substitution of its judgment for that of the trial court?

We mention one final point. The Rules of Civil Procedure do not allow counsel on one side to depend on his opponent for every item of evidence that the opponent is going to offer. The Rules contemplate the identification of witnesses and subject matter so as to permit the adversary to take depositions or to seek interrogatories or move for a more detailed statement as to what the evidence is going to be, but all of these avenues are open and to place all of the burden on the plaintiff to the detriment of his client is, to say the least, grossly unjust.

In closing, there is no gainsaying that the sanction imposed was excessive considering the circumstances, including the length and difficulty of the trial and the fact that there is no real issue as to Ford's liability.

This was a well conducted trial, as lengthy and complex trials go. Unfortunately, it is impossible to have a perfect trial, human fallibility being considered. This is especially true from the standpoint of technical perfection. This does not mean that perfection should not be sought after, but there is not an indication that this goal was ever abandoned in the present case.

For all of these reasons, I respectfully disagree with the reasoning and conclusion of the majority opinion.